IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ROBERT W. AVERY                                                      PLAINTIFF

              v.                       Civil No. 07-5111

SHERIFF KEITH FERGUSON;
MAJOR DRAKE; DETECTIVE
CHRIS SPARKS; ET AL.,                                          DEFENDANTS


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

        Robert W. Avery brings this *pro se* civil rights action pursuant to 42 U.S.C.  § 1983.

Avery contends his constitutional rights were violated in the following ways:  (1) SWAT made

an illegal entry into the house located at 10810 Winningham Road in Gentry, Arkansas, on

January 16, 2007, in order to arrest him; (2) excessive force was used against him during his

arrest; (3) Sheriff Ferguson, Major Drake, and Captain Jones, the commanding officers at the

scene, did nothing to prevent the abuse or to protect his rights; (4) excessive force was used

against him on January 18, 2007, by Deputies Carlton and Tomlin while he was incarcerated at

the Benton County Detention Center; and (5) Captain Hunter Petray, with prior knowledge of

the violent tendencies of Deputies Carlton and Tomlin, showed deliberate indifference towards

Avery's safety.

        Defendants filed a motion for summary judgment (Doc. 62).  To assist plaintiff in

responding to the summary judgment motion, I entered an order (Doc. 86), directing Avery to

complete, sign, and return an attached questionnaire that would serve as his response to the

summary judgment motion.  Avery filed a timely response to the court's questionnaire (Doc.

AO72A
(Rev. 8/82)

87).[1]  The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motion.  Also before the undersigned for report and recommendation is Avery's motion for injunctive relief (Doc. 88) and defendants' response to the same (Doc. 89).

## I.  BACKGROUND

On September 22, 2006, Investigator Robert Holly filed an affidavit of probable cause to obtain a warrant for Avery's arrest for aggravated robbery in violation of Ark. Code Ann. § 5-12-103, a Class Y felony, in the case of State v. Robert W. Avery, in the Benton County Circuit Court.  *Plaintiff's Response* (Doc. 87) at ¶ 1 (hereinafter *Resp.*).  On September 22nd Judge Scott found probable cause existed for the issuance of an arrest warrant for aggravated robbery.  *Id.* at ¶ 2.

On October 3, 2006, an alias arrest warrant was issued for Avery for failure to appear on a theft of property charge, a class D felony.  *Resp.* at ¶ 3.  On October 9, 2006, the Springdale District Court issued a warrant for his arrest on a failure to appear charge.  *Id.* at ¶ 4.

On October 11, 2006, Deputy Prosecuting Attorney Jay Moore signed a notarized affidavit of probable cause for Avery's arrest for violation of the Arkansas Hot Check Law. *Resp.* at ¶ 5.  On November 16, 2006, Deputy Prosecuting Attorney Shane Wilkinson and Prosecuting Attorney Robin Green submitted a petition to incarcerate Avery for failure to pay fines, fees, and costs in violation of the court's orders of November 18, 2002, July 10, 2004, and July 19, 2006.  *Id.* at ¶ 6.  An affidavit in support of the petition was submitted.  *Id.* at ¶ 7.  On

---

[1] We note that Avery did not sign and date the questionnaire response.  On the final page of the questionnaire, there is a place for him to date and sign it under the following declaration:  "I declare under penalty of perjury that the foregoing is true and correct."  This declaration makes the response the equivalent of an affidavit.  28 U.S.C. § 1746.

November 28, 2006, Judge Tom Keith found probable cause supported the issuance of a warrant for Avery's arrest on the petition to incarcerate him for failure to pay fines, fees, and costs. *Id.* at ¶ 8.

On December 4, 2006, Brenda DeShields, Clerk of the Benton County Circuit Court, issued a bench warrant for Avery's arrest, last known address, 823 S. Wright Street, Siloam Springs, Arkansas, for failure to pay fines, fees, costs, breaking and entering, criminal mischief, and possession of drug paraphernalia. *Resp.* at ¶ 9.

In his January 17, 2007, incident report Investigator Robert Holly stated that in September of 2006 he had obtained a warrant for Avery's arrest for aggravated robbery. *Resp.* at ¶ 10.  He indicated an extensive search had been conducted for Avery.  *Id.*

In early January of 2007, Holly indicated he was contacted by Deputy Eric Jones with information that a tip had been received indicating Avery sometimes stayed at an abandoned farmhouse located at 10810 Winningham Road in Gentry, Arkansas. *Defendants' Exhibit* 1A at page 25.  Avery, however, asserts this house was not abandoned and was the home of Tammy Adams. *Resp.* at ¶ 11.  Avery indicates he lived at 51511 So. 700 Road, Colcord, Oklahoma. *Id.*

Holly and Investigator Travis Newell went to the house and found it empty. *Defts' Ex.* 1A at page 25; *Resp.* at ¶ 12.  However, they found a makeshift living quarters in one of the rooms. *Id.*  On one wall there was a piece of artwork that said "Tammy Adams." *Id.*

Holly had received information that Adams was Avery's new girlfriend. *Defts' Ex.* 1A at page 25.  According to Avery, he and Adams were good friends who had dated at one time and were in the process of reconciliation. *Resp.* at ¶ 13.

On January 16, 2007, Deputy Robert Crowe drove by the residence on Winningham Road and saw smoke coming from the chimney and a red vehicle parked in the rear of the house. *Resp.* at ¶ 15(A). The vehicle, a red Ford Explorer, was Avery's vehicle. *Id.* at ¶ 15(B).

According to defendants, the owner of the property, George Winningham, was contacted and he said there should not be anyone at the property. *Defts' Ex.* 1(A) at page 25. Winningham gave the Sheriff's Office permission to enter the property and the house. *Id.*

Avery maintains that the defendants entry was made based on the verbal consent given by a person who claimed to be George Winningham. Doc. 87-2 at page 8. Avery asserts George Winningham does not own the property nor did he give consent to enter the property. *Resp.* at ¶ 16. At the same time, Avery states George had allowed Tammy Adams to live out there. *Id.* According to Avery, written permission to search was obtained by Brandon Rogers from Barbara Winningham after Avery's arrest. *Id.* If written consent was needed, Avery asks why it wasn't obtained prior to the initial entry into the home. Doc. 87-2 at page 8.

Over the past couple of months, Holly had learned that Avery carried a Ruger .22 on his person at all times. *Defts' Ex.* 1A at page 25. The rifle had a large capacity magazine attached to it. *Id.* Holly notified command staff that Avery was most likely armed and the decision was made that the SWAT members would make entry on the residence. *Defts' Ex.* 1A at page 25; *Resp.* at ¶ 18.

According to Sgt. Jarred Crabtree the entry of the house and the events thereafter occurred as follows:

> The SWAT team van and armored vehicle were used to deploy the SWAT team members. Members from . . . the SWAT team deployed from both vehicles on opposite sides of the house. SWAT team members regrouped at the door and

-4-

entered as one unit.  Members of the SWAT team were also posted on the perimeter while the building was entered.

Upon entry into the residence SWAT team members deployed a flash bang device through the window on the west side of the house.  Just inside the residence SWAT team members were met with severe chemical fumes.  SWAT team members began yelling "Sheriff's Office" several times as we moved throughout the house.  Many members complained of burning eyes, nose, throat and the quality of air was very hard to breathe.  Many SWAT team members exited the residence because they had trouble breathing due to the chemical fumes.  The house was not completely cleared during the team's first entry.  SWAT team members put on their gas masks to help with their breathing.  After putting on gas masks several members re-entered the house and began searching.  My gas mask as well as several other members' gas masks were fogging and made it difficult to see our surroundings.  Additionally, their was very little lighting inside the house and flashlights were utilized.  I removed my gas mask as I continued to search.  Deputy Wade Porter was with me as we continued to search the house and he removed his gas mask as well.

Deputy Porter and I made our way to a closet located toward the center of the house.  During this time our eyes, nose, and throat were burning.  I could see someone standing inside the closet through the opening.  I could only see one arm through the opening and the person was trying not to move.  The person was wearing a jacket with a desert camouflage pattern.  I identified myself as being with the Sheriff's Office SWAT team and told the person to show his hands.  The person did not move.  I again told this person to show his hands and he would not move.  I could only see one hand and it was down by his side.  The other half of this person was blocked by the closet.  I told Deputy Porter to cover me as I was going to take the person to the ground.  I reached and grabbed the arm that was exposed through the opening.  As I grabbed the person's arm I was immediately met with resistance.  The person was identified as Robert Avery.  Avery stiffened up his arm and would not allow me to pull him from the closet.  I grabbed Avery's arm with both hands and pulled him through the opening.  Avery only came a short way out of the closet and appeared to be holding on to something in the closet.  I continued to try and pull Avery from the closet, but he was holding on to something inside the closet.  As I continued to pull Avery's arm he let go of what appeared to be a shotgun or rifle and came out of the closet.  As Avery came out of the closet, he swung a closed fist at me with his left hand.  I moved backward and Avery missed my head.  Avery became unbalanced and fell toward Deputy Porter and I.  Deputy Porter began assisting me with attempting to get Avery to the ground and his hands behind his back.  Avery became more aggressive and started punching and pushing at Deputy Porter and I.  Deputy Porter and I struggled to breathe as we attempted to place Avery under arrest due to the chemical fumes.

-5-

Other members of the SWAT team heard Deputy Porter and I and came to assist. Investigator Newell and Atchison assisted with placing Avery on the floor and placing his hands behind his back. Investigator Sparks placed handcuffs on Avery. Following the altercation with Avery I was very lightheaded and dizzy. I immediately went outside to fresh air. Deputy Porter, Investigator Atchison, and Investigator Newell escorted Avery outside and sat him on the ground a short distance from me. A 12 gauge shotgun was located within the closet where Avery was found. The shotgun was also found to be loaded. The shotgun was turned sideways and appeared to be caught against the walls when we were attempting to pull Avery from the closet.

SWAT team members including me regrouped at the front door and re-entered the house. We conducted a secondary search that revealed a female named Tammy Adams. Adams was hiding in part of the wall inside the house. Adams resisted for a short moment, but was quickly placed into custody.

*Defts' Ex.* 1 at pages 6-7.

Avery objects to Crabtree's entire summary of the events that occurred that day. *Resp.* at ¶ 19; Doc. 87-2 at pages 1-2. Avery notes that the supplement to the report containing the detailed summary of the events of that day was not written until January 4, 2008, nearly a year after the events occurred. *Id. See Defts' Ex.* 1 at pages 6-7.

He maintains the statements, particularly those about him taking a swing at Crabtree and resisting arrest, were made up after he filed his civil rights suit. *Resp.* at ¶ 37; Doc. 87-2 at pages 1-2. He points out that in a prior version of the report it merely stated he was found hiding in the closet with a loaded shot gun and taken into custody without incident. *Plff's Ex.* 4 at page 1.

Avery denies there was a presence of severe chemical fumes. *Resp.* at ¶ 20. If there had been, he states he and Adams would not have been able to breathe. *Id. See also Resp.* at ¶ 21 (We were not using gas masks and were breathing just fine).

According to Avery he was found in a walk through hall/closet on his knees with his hand behind his head with his fingers laced in a posture of submission. *Resp.* at ¶ 24. Avery indicates he told Crabtree and Porter: "Don't f------ shoot me." *Id.* at ¶ 25.

Avery states he offered no resistance. *Resp.* at ¶ 31. He denies he swung a fist at Crabtree. *Resp.* at ¶ 34. He also notes he was not charged with resisting arrest. *Id.* at ¶ 31. He

Avery maintains he was already on the ground when the others came to assist Crabtree in beating him. *Resp.* at ¶ 36 (Porter), ¶ 39 (Newell and Atchison). Avery states he was forced down, beaten, and interrogated. *Id.* at ¶ 40.

Avery contends despite being on his knees in a submissive position, he was kicked in the face, ribs, and other parts of his body. *Resp.* at ¶ 80. He contends Crabtree took part in this. *Id.* With respect to Atchison and Newell, Avery contends they applied kicks and stomps to various parts of his body while assisting Crabtree. *Id.* at ¶ 81 & ¶ 82.

Avery also contends Porter assisted Crabtree by applying excessive force to Avery. *Resp.* at ¶ 90. He states Porter "kicked me & stomped on me right along side of Crabtree." *Id.* Avery contends Porter was one of the five original who beat him for failing to answer questions. *Id.* Moreover, he maintains each failed to intercede and stop the beating. *Id.* at ¶¶ 80, 81, 82, 90.

With respect to Howard Gage, Rick Holland, Josh Chapman, Richard Conner, Charles Robbins, Eric Warzecha, and Tim Srader, Avery contends they failed to intervene and protect Avery from the unlawful use of force by other officers in their presence. *Resp.* at ¶¶ 83-89. According to Crabtree's report, Investigator Sparks placed handcuffs on Avery. *Defts' Ex.* 1 at page 7. At the time, Avery states he could not see who was twisting his arm behind his back because the SWAT members had on masks to hide their identity. *Resp.* at ¶ 40. Avery maintains

-7-

Sparks used excessive force in cuffing him that resulted in his suffering an "extremely painful[] shoulder strain & multiple bruises etc." *Id*. at ¶ 76.  Avery asserts Sparks also applied excessive force when he refused to answer questions.  *Id.*  If Sparks was not the officer who caused his injuries, Avery states Sparks nevertheless failed to protect Avery from his fellow officers who were committing wrongful acts in his presence.  *Id.*

Avery denies a 12 gauge shotgun was found in the closet where he was.  *Resp.* at ¶ 43. He maintains he was not "in possession" of any firearms.  *Id.* at ¶ 44.  He refers the court to the evidence recovery log.  *Plaintiff's Exhibit* 3 (hereinafter *Plff's Ex.* 3).  The log indicates a .22 caliber rifle was found in what is described on the evidence log as the southern bedroom.  *Id.* Avery does not explain how this log establishes he was not in possession of firearms or that the rifle was not found in the closet where he was located.

Avery was taken to the Siloam Springs Memorial Hospital where he complained of pain to his head, face, chest, and right shoulder.  *Resp.* at ¶ 47.  He was noted to have abrasions on his forehead, right cheek, and chin.  *Defts' Ex.* 2 at page 2.  Avery asserts the injuries covered other parts of his body as well.  *Resp.* at ¶ 48.  He was found to have a right shoulder strain and a fracture of his #6 left rib.  *Id.* at ¶ 49.  X-rays of his face were normal.  *Id.*

Avery was discharged with instructions to take 800 mg. of Ibuprofen three times a day with food.  *Defts' Ex.* 2 at page 9.  He was to follow up with his regular doctor.  *Id.*  Avery states he was also given verbal orders to remain on bed rest with limited movement/activities.  *Resp.* at ¶ 50.

-8-

Avery was booked into the Benton County Detention Center (BCDC) on January 16, 2007. *Resp.* at ¶ 51. On January 18, 2007, Sgt. Tomlin, Deputy Carlton, and Sgt. Culotta each submitted an incident report regarding Avery. *Id.* at ¶ 52.

At approximately 0500 or 5:00 a.m., Deputy Carlton was in E-pod pulling lock down mats and heard Corporal Echols give several verbal commands via intercom for everyone to get out of their bunks and come out of their cells. *Defts' Ex.* 6 at page 1; *Resp.* at ¶ 53. After a few minutes, Sgt. Culotta told Carlton to enter E-pod and make sure everyone was out of their bunks. *Defts' Ex.* 6 at page 1; *Resp.* at ¶ 54.

Carlton approached Avery's cell in E-pod, cell number 236, and noticed him still lying on his bunk. *Defts' Ex.* 6 at page 1; *Resp.* at ¶ 55. Carlton told Avery to get up. *Resp.* at ¶ 56. Avery did not comply and said he was on bed rest from the doctor. *Id.* Avery states he was injured and couldn't move without being in extreme pain. *Id.*

Echols notified Carlton that Avery was not on bed rest. *Defts' Ex.* 1 at page 1. According to Carlton, Avery responded: "You'll have to beat me to get me up." *Defts' Ex.* 6 at page 1. Avery states he would never have told Carlton that. *Resp.* at ¶ 57. Avery indicated he was already injured and couldn't fight if he wanted to. *Id.*

Carlton called for assistance and grabbed Avery by the left arm and pulled him to the floor. *Resp.* at ¶ 58. Tomlin and Culotta entered the cell. *Defts' Ex.* 6 at page 1. Tomlin took Avery's right arm and Culotta took his left arm. *Id.* Carlton placed Avery in handcuffs. *Id.*

Avery states this incident "involved more physical violence on the part of the deputies." *Resp.* at ¶ 59. He maintains they beat him in front of thirty witnesses. *Id.*

-9-

With respect to Carlton, Avery contends he yanked Avery onto the floor, put him on his stomach, and put his knee in his back and ribs. *Resp.* at ¶ 79. Avery maintains Carlton was kneeing him and applying excessive force on his arms and shoulders. *Id.* Avery states his head and forehead were busted open and there was blood on him and the floor. *Id.*

With respect to Tomlin, Avery contends he placed his knee on Avery's fractured rib. *Resp.* at ¶ 78. Avery also contends Tomlin applied an excessive amount of force to his arm. *Id.*

Tomlin escorted Avery to pod control and he was informed he was being locked down for refusing to obey the order of a deputy. *Resp.* at ¶ 60. Culotta reported that when he first arrived at Avery's cell he was attempting to tuck his right arm underneath his torso. *Resp.* at ¶ 62. Culotta grabbed Avery's right arm and administered a straight arm lockout. *Id.* Avery agrees he tried to tuck this arm underneath him but he states it was because of the injury involving his right shoulder. *Id.*

Culotta held onto Avery's arm and wrist until the situation was under control. *Defts' Ex.* 6 at page 2. According to Avery, the situation was not out of control. *Resp.* at ¶ 63. Instead, he maintains he was beaten by these men while he was already injured. *Id.*

As Tomlin helped Avery stand, Culotta indicated he observed a small amount of blood on the floor. *Defts' Ex.* 6 at page 2. Avery states the blood was on the floor and his face and head. *Resp.* at ¶ 64. He states the blood was from his face and head being "rammed into" the concrete floor. *Id.*

Tomlin indicated that he grabbed Avery's arm and that he started to yell while he was restrained on the floor. *Defts' Ex.* 6 at page 1. Avery states he was yelling in pain. *Resp.* at ¶ 65. When Tomlin asked why Avery didn't get out of his bunk when told to do so, Avery stated

-10-

he was on bed rest. *Resp.* at ¶ 66. Tomlin told Avery that he had never been told that and it was not in the log book. *Id.*

Avery was given a disciplinary for disobeying the orders of a deputy. *Resp.* at ¶ 67. He was found guilty and given ten days lock down and loss of privileges. *Defts' Ex.* 6 at page 4. Defendants' records indicate the decision was appealed and affirmed on appeal. *Id.* However, Avery asserts he was never given a disciplinary hearing. *Resp.* at ¶ 68. As he received no hearing, he states he didn't appeal the decision. *Id.* at ¶ 69.

Avery was asked whether prior to January 18, 2007, he had informed Captain Petray that he had reason to believe his safety was in danger from Tomlin or Carlton. *Resp.* at ¶ 93. He responded yes. *Id.* He stated he had let Captain Petray know through past grievances, complaints, and lawsuits. *Id.* Avery also maintains the attack on him was not an isolated incident. *Id.* He contends "beatings are common place at the BCDC." *Id.*

On June 7, 2007, Avery submitted a grievance complaining that during his arrest he had received fractured ribs and black eyes. *Resp.* at ¶ 69. He stated he was being charged by the hospital when it should have been the county's bill. *Id.* In response, Captain Petray told Avery to take that up with the hospital. *Id.*

On June 8th Avery submitted a grievance stating that he had broken ribs and black eyes. *Resp.* at ¶ 71. He stated that during his arrest the SWAT team continued beating him even after he was cuffed. *Id.* In response, someone wrote: "What is your request." *Id.* at ¶ 72.

On June 24th Avery submitted a grievance in which he complained about the injuries he received during his arrest and interrogation. *Resp.* at ¶ 73. He stated the SWAT team kicked and

-11-

stomped him while interrogating him.  *Id.*  In response, Captain Petray stated he only handled

jail related issues.  *Id.*

      Sheriff Keith Ferguson was present when Avery was arrested.  *Resp.* at ¶ 74.  He

supervised the raid.  *Id.*  Avery contends Sheriff Ferguson failed to prevent the unconstitutional

practices from occurring and has created policies or customs under which the unconstitutional

practices occur.  *Id.*

      With respect to Captain Jones, Avery states he was in a supervisory position and grossly

negligent in that position.  *Resp.* at ¶ 91.  Avery states Jones allowed his subordinates to commit

wrongful acts and failed to intervene during the constitutional violations.  *Id.*  Avery maintains

the failure to intervene and corrective inaction constituted deliberate indifference and tacit

authorization of the violative practices of the SWAT members.  *Id.*

      With respect to Major Drake, Avery contends he failed to properly train and supervise

those under him.  *Resp.* at ¶ 75.  Moreover, Avery maintains Drake's corrective inaction

amounted to deliberate indifference and/or tacit authorization of the violative practices of his

subordinates.

## II.  SUMMARY JUDGMENT STANDARD

      Summary judgment is appropriate if, after viewing the facts and all reasonable inferences

in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary

judgment has made a sufficient showing, the burden rests with the non-moving party to set forth

-12-

AO72A
(Rev. 8/82)

specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III.  DISCUSSION

Defendants have now moved for summary judgment on each of Avery's claims.  First, they contend there was no illegal search or seizure.  Second, they contend there was no personal involvement of the supervisory officials during the alleged incidents.  Third, they contend Captain Petray did not fail to protect Avery.  Fourth, they contend there was no excessive force used against Avery either at the scene of his arrest or at the BCDC on January 18th.  Finally, defendants maintain they are entitled to qualified immunity.

#### *Illegal Entry to Arrest*

Defendants argue that the warrant for Avery was validly issued and they are therefore entitled to qualified immunity.  *See e.g., Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)("Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of immunity be lost.").  Avery does not contest the validity of the warrant for his arrest.  Instead, he maintains the officers had no right to enter the property in question, to search it, or arrest him,

-13-

without a search warrant or the consent of the occupants.  Doc. 87-2 at page 8.  In other words, Avery contends the police made an illegal entry onto the Winningham property to arrest him.

A similar argument was addressed in *United States v. Cantrell*, 530 F.3d 684 (8th Cir. 2008).  In that case, officers had information from a confidential informant that Cantrell was living at the home of Debra James.  *Id.*, 530 F.3d at 687.  To get to James's rural residence, they had to cross land owned by James's father, Charles James.  *Id.*  Two years earlier Charles James had given the officers consent to enter onto his land to get to the house if they believed something illegal was going on.  *Id.*  The consent was not limited in time and never withdrawn. *Id.*  James was then arrested outside of the home and gave consent for the officers to enter the home to place Cantrell into custody.  *Id.*

Cantrell argued the entry onto the James's property was invalid because it was made without a search warrant and without a reasonable belief Cantrell was at the James's residence. *Cantrell*, 530 F.3d at 689.  The court stated:

> [P]olice officers do not need a search warrant to enter the home of the subject of an arrest warrant in order to effectuate the arrest.  An arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within. Officers may enter a third party's home to execute an arrest warrant if the officers have a *reasonable belief* that the suspect resides at the [third party's home] and have reason to believe that the suspect is present at the time the warrant is executed.  Otherwise, officers cannot legally search for the subject of an arrest in the home of a third party without a search warrant, unless exigent circumstances exist or officers have obtained the third party's consent.

*Cantrell*, 530 F.3d at 689-90 (citations and internal quotations omitted).

In this case, there is no genuine issue of fact as to whether an illegal entry of the Winningham property occurred because:  (1) the officers had a reasonable belief Avery was

-14-

inside the home at the time the warrant was executed; (2) the officers obtained Winningham's consent at the time to enter the home; (3) the officers had received a tip that Avery had sometimes been staying at the farmhouse located at 10810 Winningham Road with Tammy Adams; and  (4) Avery's vehicle, a red Ford Explorer, was seen parked at the rear of the house that day.  This information was more than sufficient to support their reasonable belief that Avery was inside the house at Winningham Road at the time they executed the warrant.

With respect to the consent given by George Winningham, Avery argues George Winningham is not the owner of the property in question.  However, the only support for this argument Avery offers, is his citation to the incident report of Investigator Brandon Rogers. (Doc. 87-2).  In his report, Rogers states he met with Barbara Winningham of Gentry, Arkansas, and she advised him that she owned the old dairy farm located at 10810 Winningham.  *Id.* Barbara Winningham further states that no one had permission to be on the property and should not be trying to stay in the buildings.  *Id.*  Barbara Winningham then signed a permission for law enforcement to search the property and all buildings for illegal items and trespassers.  *Id.*  This only establishes that Barbara Winningham had an ownership interest in the property not that she was the sole owner of the property or that George Winningham had no ownership interest in the property and no authority to consent to its search by law enforcement officers.  *See e.g., United States v. Hinkle*, 456 F.3d 836, 840-841 (8th Cir. 2006)(property owner has both actual and apparent authority to consent to search property and to search anywhere on the property and leaseholder had sufficient interest to consent to search of entire property).

### *Excessive Force During Arrest–January 16, 2007*

-15-

"All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment."  *Winters v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001)(citation omitted).  *See also, Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006).  "Police officers are liable for the use of excessive force when they use force that is not objectively reasonable in light of the facts and circumstances confronting them."   *Goff v. Bise*, 173 F.3d 1068, 1073 (8th Cir. 1999)(citations omitted).  In *Lawson v. Hulm*, 223 F.3d 831 (8th Cir. 2000), the court stated:

> Although there can be no question that the Fourth Amendment prohibits unreasonable seizures of the person, it is also well established that "not every push or shove violates the Fourth Amendment. The applicable test is "whether the force used to effect a particular seizure is reasonable."   In the context of a claim of excessive force, the "reasonableness" inquiry must be an objective one in that the court must only evaluate "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

> The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."

*Lawson*, 223 F.3d at 834 (citations omitted).

The use of some force by police is reasonable when an arrestee flees,  resists arrest, or disobeys orders.  *See e.g., Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990).  The lack of injury or a minor degree of injury is also relevant in determining whether the force used was excessive.  *Id.*   Additionally, the court may consider whether any injury

-16-

suffered is explained by the arrestee's own actions.  *See e.g., Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994).

In this case, the summary judgment record consists of the incident report, the affidavit of probable cause used to obtain Avery's arrest warrant, the medical records from Siloam Springs Memorial Hospital, and plaintiff's summary judgment response.

The parties provide somewhat contradictory versions of what occurred on January 16, 2007.  However, some of the facts are uncontroverted.  Avery was arrested in the home located at 10810 Winningham Road following the entry of the home by SWAT members.  He had been hiding in a walk through hall/closet.  *Defts' Ex.* 1 at page 6; *Resp.* at ¶ 24.  Following his arrest, he was treated at the Siloam Springs Memorial Hospital.  *Defts' Ex.* 2.  He was noted to have abrasions on his right forehead, check, left chin, his right shoulder, left arm, and lower back.  *Id.* at pages 2-3  He had a fracture of the left sixth rib and a right shoulder strain.  *Id.* at page 3.

The remainder of the facts are controverted.  Avery maintains he was found on his knees with his hands behind his head and his fingers laced together.  *See e.g., Resp.* at ¶ 24.  He maintains he was in a posture of submission.  *Id.*  He denies that a firearm was found on his person.  *Id.* at ¶ 33.  Avery maintains he never resisted arrest.  *See e.g., Id.* at ¶ 31.  However, he states he was thrown face down on the ground beaten and interrogated.  *Id.* at ¶¶39-40.  He contends Sparks, Crabtree, Porter, Atchison, and Newell utilized excessive force against him.  The remaining SWAT members and/or supervising officers he maintains failed to intervene to stop a constitutional violation that was occurring in their presence and with their knowledge.

In contrast, defendants maintain Avery refused to obey their commands, had to be pulled from the closet where he was hiding, was resisting, and had been holding onto what appeared to

-17-

be a shotgun or rifle.  *Defts' Ex.* 1 at pages 6-7.  Defendants also maintain that as Avery came out

of the closet, he swung a closed fist at Crabtree.  *Id.* at page 7.  As Porter helped Crabtree get

Avery to the ground, defendants maintain Avery became more aggressive and started punching and

pushing Porter and Crabtree.  *Id.*

I find there are genuine issues of material fact as to whether excessive force was used

against Avery.  The court cannot at the summary judgment stage merely choose to believe the

defendants' version of the events of January 16th and disbelieve plaintiff's version of the events.

Clearly there is a factual dispute as to what occurred during Avery's apprehension and arrest.

### *Supervisory Liability Claims against Ferguson, Drake, and Jones*

Benton County "cannot be held vicariously liable for its agents' actions under § 1983."

*Riehm v. Engelking*, 538 F.3d 952, 962 (8th Cir. 2008)(*citing Monell v. Dep't of Soc. Servs.,* 436

U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).  Instead, to hold Benton County liable

Avery would have to identify a county custom or policy.  *Id.*  Here, Avery merely asserts a policy

or custom existed under which the unconstitutional practices occurred.  *See Resp.* at ¶ 74.  He does

not identify the policy or custom, explain how it was the moving force behind the unconstitutional

acts, or provide any support for this bare assertion.  *Id.*  In short, Avery presented no evidence of

the existence of a policy or custom or any facts to support his claim.

"A supervisor may be held individually liable under § 1983 if he directly participates in the

constitutional violation or if he fails to train or supervise the subordinate who caused the

violation."  *Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007).  "The standard of

liability for failure to train is deliberate indifference.  The standard of liability for failure to

-18-

supervise is demonstrated deliberate indifference or tacit authorization of the offensive acts." *Id.* (citations and internal quotation marks omitted).

Here, Avery does not argue that Sheriff Ferguson, Major Drake, or Captain Jones personally used excessive force against him. Instead, with respect to Sheriff Ferguson, he merely alleges he supervised the raid and was grossly negligent in supervising his subordinates. *Resp.* at ¶ 74. With respect to Major Drake, Avery states he failed to properly train and supervise the men under him and failed to take corrective action. *Id.* at ¶ 75. With respect to Captain Jones, Avery asserts he was grossly negligent in performing his role of supervisor and allowed his subordinates to commit wrongful acts, failed to intervene, and failed to take corrective action. *Id.* at ¶ 91.

Avery presents no facts or evidence to support his assertions. *Riehm*, 538 F.3d at 963 ("The Riehms present no evidence that DeBevec was directly involved in the alleged constitutional violations or that she failed to train or supervise Diercks."). Avery does not state in what particular ways Sheriff Ferguson, Major Drake, or Captain Jones failed to train or supervise the SWAT members. Avery does not point to the lack of any departmental policy or training procedures regarding the entry of homes, the obtaining of consent from the owners of property, the use of flash bang distraction devices, the apprehension of individuals believed to be armed, the use of gas masks when chemical fumes are detected, the management of the team when there is little lighting in the home being entered, the use of restraint devices, etc.

In short, it appears that Avery seeks to hold Sheriff Ferguson, Major Drake, and Captain Jones liable simply because they are the supervisory officers who were on the scene that day. This is not a basis of individual liability under § 1983.

-19-

***Excessive Force During Pretrial Detainment–January 18, 2007***

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

At the time of the alleged use of force by Carlton and Tomlin, Avery was a pretrial detainee. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional

-20-

interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

It is undisputed that Avery remained in his bunk after the order was given for everyone to get out of their bunks. *Defts' Ex.* 6 at page 1. Avery did not comply with Carlton's orders to get up. *Id. See also Resp.* at ¶ 56. According to Avery, he was injured and could not move without being in extreme pain. *Resp.* at ¶ 56. Avery told Carlton he was on bed rest from the doctor. *Id.* at ¶ 56. Echols advised Carlton that Avery was not on bedrest. *Defts' Ex.* 6 at page 1.

Carlton called for assistance and grabbed Avery by the left arm and pulled Avery to the floor. *Defts' Ex.* 6 at page 1; *Resp.* at ¶ 58. It is at this point that the stories of the parties diverge. Defendants maintain Tomlin took Avery's right arm, Culotta, his left, and Carlton then placed him in handcuffs. *Defts' Ex.* 6 at page 1. Defendants indicate Avery was then escorted to pod control and informed he was being locked down for refusing to obey the order of a deputy. *Id.*

Avery maintains the men beat him in front of thirty witnesses. *Resp.* at ¶ 59. Avery asserts Carlton yanked him to the floor and his face and head were rammed into the concrete floor. *Id.* at ¶ 64. He maintains Tomlin put his knee on his fractured rib and applied an excessive amount of force to his arm causing him to yell out in pain. *Id.* at ¶ 78. Avery

-21-

maintains Carlton put his knee on Avery's back and ribs and applied excessive force to his arms and shoulders. *Id.* at ¶ 79. Avery indicates his head and face were busted open. *Id.*

If the events occurred as suggested by Carlton and Tomlin, the use of force was no doubt reasonable. However, if the events occurred as suggested by Avery, the amount of force used may have been excessive. At the summary judgment stage, the court cannot chose to believe one version of the events and disbelieve the other. Genuine issues of material fact preclude the entry of summary judgment in defendants' favor on this claim.

### Supervisory Liability Claim Against Captain Petray

Avery maintains that the attack on him was not an isolated incident and that beatings are common place at the BCDC. *Resp.* at ¶ 93. He states he had placed Captain Petray on notice of the unconstitutional practices of his subordinates through past grievances, complaints, and lawsuits. *Id.* If he had a copy of these documents, Avery was asked to attach the documents to the summary judgment response. *Id.* Avery indicated he was still waiting on "these discovery items." *Id.* Furthermore, he maintains Captain Petray failed to properly train, supervise, and control his subordinates.

We find Captain Petray is entitled to summary judgment on this claim. The doctrine of respondeat superior does not apply under section 1983. *See e.g., Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001). Instead, Captain Petray may only be held liable if his failure to train or to supervise the offending employee caused the deprivation of constitutional rights and he had notice that the training procedures were inadequate and likely to result in a constitutional violation. *Id.* While Avery makes the conclusory allegation that Captain Petray failed to

-22-

supervise and train Carlton and Tomlin and that these failures resulted in the violation of his constitutional rights, Avery does not support these allegation with any facts.  *See e.g., Riehm v. Engelking*, 538 F.3d 952, 963 (8th Cir. 2008)("The Riehms present no evidence that DeBevec was directly involved in the alleged constitutional violations or that she failed to train or supervise Diercks.").  Avery simply makes these blanket statements.  Captain Petray cannot be held liable based solely on his general responsibility to oversee the operations of the BCDC.  *See e.g., Popoalii v. Corr.  Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008); *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)(when supervisory liability under § 1983 attaches).  We find no genuine issue of material fact exists on this claim.

### IV. MOTION FOR INJUNCTION

Avery requests an injunction limiting the period of time in which the defendants may detain or hold him for court appearances (Doc. 88).  He notes that the defendants pick him up at the Arkansas Department of Correction (ADC) seven days prior to his scheduled court date and don't return him to the ADC until seven to ten days after his court date.  Avery states it is his belief the defendants are bringing him up from the ADC for such long periods of time in order to interfere with the prosecution of his "civil complaints."  He asks the court to issue an injunction directing the defendants to pick him up from the ADC two days prior to court and return him to the ADC two days after the conclusion of his court proceeding.

In opposition, defendants urge the court to deny Avery's motion (Doc. 90).  They maintain Avery has failed to meet his burden of proving a preliminary injunction should issue.

-23-

Moreover, they maintain to issue such an injunction would be an unwarranted intrusion into the administration of the detention center.

Rule 65 of the Federal Rules of Civil Procedures governs the issuance of temporary restraining orders and preliminary injunctions.  In deciding a motion for a temporary restraining order or a preliminary injunction, the courts are instructed  to consider what have come to be known as the *Dataphase* factors.  These factors are:  (1) the probability of success on the merits;(2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc).  *See also Minnesota Mining and Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1307 (8th Cir.1997);  *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir.1993).  No single factor in itself is dispositive;  rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction. *See Sanborn*, 997 F.2d at 486; *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.*, 815 F.2d 500, 503 (8th Cir.1987).

In the motion for injunctive relief, Avery maintains the BCDC defendants are holding him for periods of longer than necessary for court in an effort to hinder his efforts in various civil rights lawsuits he has pending.   Retaliatory behavior constitutes a separate cause of action from the excessive force claims asserted in the complaint. *See Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)(no preliminary injunction where motion for relief was based on assertions of retaliation that were entirely different from initial claim). Because Avery's claim for injunctive relief is based

-24-

on an assertion entirely different from the claims made in his complaint, I find no basis on which to issue a preliminary injunction.

## V.  CONCLUSION

I therefore recommend that the motion for summary judgment (Doc. 62) be granted in part and denied in part.  Specifically, I recommend the motion be granted with respect to the following claims:  (1) Avery's claim that there was an illegal entry to arrest him on January 16, 2007, at 10810 Winningham Road in Gentry, Arkansas; and (2) his claims against Sheriff Keith Ferguson, Major Gene Drake, Captain Jones, and Captain Hunter Petray.  I recommend that the motion be denied with respect to Avery's claims that excessive force was used against him on January 16, 2007, and January 18, 2007.  Finally, I recommend that Avery's motion for injunctive relief (Doc. 88) be denied.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of February 2009.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-25-