```
        IN THE UNITED ST ATES DISTRICT COURT
            WESTERN DISTRICT OF ARKANSAS
                 FAYETTEVILLE DIVISION
```

**ROBERT W. AVERY**                                                    PLAINTIFF

        v.            Civil No. 07-5111

**SHERIFF KEITH FERGUSON;
MAJOR DRAKE; DETECTIVE
CHRIS SPARKS; DETECTIVE
ROBERT HOLLY; SGT. TOMLIN;
DEPUTY CARLTON; SGT. JARED
CRABTREE; NATHAN ATCHISON;
TRAVIS NEWELL; HAROLD GAGE;
RICK HOLLAND; JOSH CHAPMAN;
RICHARD CONNER; CHARLES
ROBBINS; ERIC WARZECHA;
TIM SRADER; WADE PORTER;
CAPTAIN JONES; and CAPTAIN
HUNTER PETRAY**                                                      DEFENDANTS

## O R D E R

Now on this 17th day of September, 2009, come on for consideration the **Report And Recommendation Of The Magistrate Judge** (document #151) and plaintiff's **Objection To The Report And Recommendation Of The Magistrate Judge Of 04/13/09** (document #152) ("Objections"), and the Court, being well and sufficiently advised, finds and orders as follows:

1. Plaintiff Robert W. Avery ("Avery") claims that defendants Jared Crabtree ("Crabtree"), Wade Porter ("Porter"), Chris Sparks ("Sparks"), and Nathan Atchison ("Atchison") subjected him to the use of excessive force during an arrest on January 16, 2007. He contends that defendants Sheriff Keith Ferguson ("Ferguson"), Major Drake ("Drake"), and Captain Jones

("Jones") are liable to him for failing to properly train and supervise the SWAT team who made the arrest.[1]

Avery also claims that defendants Deputy Carlton ("Carlton") and Sgt. Tomlin ("Tomlin") subjected him to the use of excessive force during an incident at the Benton County Detention Center ("BCDC") on January 18, 2007.[2]

2. Magistrate Judge James R. Marschewski conducted an evidentiary hearing in the matter, and reported as follows:

(a) There is no credible evidence that excessive force was used during Avery's arrest on January 16, 2007. Arresting officers were entering a known meth lab, under conditions of limited visibility, to arrest a suspect known to carry a weapon. The also had information that another person was in the building. While some force was used, Avery was not bleeding following the arrest, and the services of the on-site ambulance were not needed. Judged from the perspective of a reasonable police officer in these circumstances, the force used was not excessive.

(b) There was no evidence that Avery was on "bed-rest" when pulled off his bunk on January 18, 2007, and no evidence - even if he were on "bed-rest" - that the defendant who pulled him off his bunk was aware of it. Nor is there evidence that Avery suffered

---

[1] Avery's claims against defendants Harold Gage, Rick Holland, Josh Chapman, Richard Conner, Charles Robbins, Eric Warzecha, and Tim Srader were dismissed during the evidentiary hearing on August 18, 2009.

[2] Avery's related claim against defendant Captain Hunter Petray was dismissed by Order dated March 12, 2009.

any injury during the incident. Under these circumstances, the force used was reasonable, not excessive.

 3. Based on his report of the evidence, the Magistrate Judge recommended that Avery's Complaint be dismissed.

 4. Avery lodges the following objections to the R&R with respect to the January 16, 2007, arrest:

 (a) that the Magistrate Judge made credibility determinations that should only be made by a jury;

 (b) that he was taken to the Emergency Room directly from the place of his arrest on January 16, 2007, and the records of that admission show his injuries;

 (c) that he was never charged with resisting arrest or possession of a weapon in connection with the arrest;

 (d) that the Magistrate Judge disregarded his testimony that he was "on his knees with his hands on his head in a position of surrender" during the arrest;

 (e) that the Magistrate Judge disregarded the testimony of Tammy Adams that he was beaten after his arrest during "a period of relative calm while the defendants attempted to question [him] about 'Larry' and 'Wayne' as well as questions about the 'lab'";

 (f) that defendants did not allege he resisted arrest and was armed until he filed a civil suit;

(g) that there are internal inconsistencies in Crabtree's reports, and inconsistencies between those of Crabtree and Porter, which negatively affect their credibility;

(h) that Holly and Porter were terminated for dishonesty, which negatively affects their credibility;

(i) that SWAT team members wear ski masks and gas masks which hide their identity, but which should not "insulate them from being accountable for their actions";

(j) that all officers present had "an affirmative duty to intervene when a constitutional violation such as an unprovoked beating occurs in [their] presence"; and

(k) that Ferguson and Drake allowed untrained persons to act as SWAT team members.

5. The Court has examined all the evidence put before it in the Objections; has listened to the tape recordings of the testimony at the evidentiary hearings conducted on August 18, 2009, and February 11, 2010; and has examined the documentary evidence from those proceedings. It finds that the Objections - as far as they relate to the arrest claim - are without merit.

Claims of excessive force during an arrest are analyzed by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person, using a "reasonableness" standard:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer

> on the scene, rather than with the 20/20 vision of hindsight. . . ."Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

**Graham v. Connor**, **490 U.S. 386, 396-97 (1989)** (internal citations omitted).

There is no dispute - and thus no need to make credibility decisions - that on January 16, 2007, defendants were attempting to arrest a person they suspected of aggravated robbery, and suspected of being armed. There is no dispute that the arrest took place in an atmosphere thick with fumes from the chemicals used in making methamphetamine, and that visibility was limited by fumes, smoke from a "flash-bang" device, and gas masks. There is no dispute that there were loaded weapons in the house, and that at least one was spotted before Avery was seized.

In addition, there is no dispute that Avery and his companion hid from the SWAT team sent to execute the search warrant, forcing the officers to search for them in the fumes and haze. Avery was found first, and refused to answer questions about who else was in the farmhouse, and where such person or persons might be hiding. The officers, of course, had no way of knowing how many other people might be hiding in the house, whether they were armed, whether they were high on methamphetamines, or similar important risk factors.

The foregoing undisputed circumstances can certainly be characterized as "tense, uncertain, and rapidly evolving," and the conduct of defendants Crabtree, Porter, Sparks, and Atchison is to be judged from the perspective of a reasonable officer in those circumstances. Methamphetamines are often associated with violence and guns, **U.S. v. Ortega**, **2010 WL 1994870 (D. Neb. 2010)**, and police officers are not unaware of these dangers. Given the known presence of a meth lab, the fumes and haze of the scene, the suspicion that there were others hiding in the house, and the known presence of weapons, a reasonable officer might well have believed that the roughness with which Avery claims to have been interrogated was necessary. No credibility determinations are necessary to reach that conclusion. Inconsistencies in the police reports, and evidence of dishonesty on the part of several witnesses, do not change the evidentiary picture. Avery's objections related to credibility are, therefore, without merit.

Avery's other objections are likewise without merit:

\*   The fact that Avery was taken to the hospital does not make out an excessive force claim, nor does his objection that he was "on his knees with his hands on his head in a position of surrender" when he sustained his injuries have merit. Avery's injuries - abrasions and contusions, a strained shoulder, and a fractured rib - do not suggest force beyond what a reasonable officer might perceive as necessary in light of the uncontroverted

circumstances of Avery's arrest.  In addition, Avery told hospital personnel that he sustained his injuries from a "fall during police arrest," not a "beating during police arrest."  He told hospital personnel that he was "[i]nvolved in altercation [with] police.  States he was kicked and knocked to ground."  These statements are not consistent with Avery's testimony that he was kneeling with his hands over his head and was then kicked; they are consistent with the testimony of the arresting officers that Avery struggled to remain wedged in a closet and had to be dragged and kicked to get him out.

   *   The fact that Avery was not charged with resisting arrest or possession of a weapon does not change what was known by the arresting officers at the time of the arrest, and is, therefore, without significance in the context of this case.

   *   There is no evidence whatsoever to support Avery's suggestion that defendants did not allege he resisted arrest and was armed until he filed a civil suit.  Holly wrote a report of the arrest two days after it occurred, in which he noted that his investigation preceding the arrest yielded information that Avery was "heavily armed" and "had a Ruger .22 rifle on his person at all times."  Holly further reported that there was a loaded 12 gauge shotgun in the closet where Avery was hiding. Tammy Adams, Avery's girlfriend and witness, testified that when the SWAT team

-7-

arrived at the farmhouse, Avery had a weapon with him, although she was not sure of the make.

    \*   Avery's objection that the wearing of gas masks should not insulate SWAT team members from liability need not be analyzed as a legal proposition, given the lack of evidence that Avery's injuries were caused by the use of excessive force in the circumstances of his arrest.

    \*   Avery's objections that officers have an affirmative duty to intervene to prevent an unprovoked beating, and that Ferguson, Jones and Drake allowed untrained personnel to act as SWAT team members, are also without merit, given that Avery has failed to present evidence of a constitutional violation in connection with his arrest.

    6.   Avery lodges the following objections to the R&R with respect to the January 18, 2007, incident at BCDC:

    (a)   that the incident took place in front of witnesses whose testimony should be evaluated by a jury;

    (b)   that his medical condition was known to BCDC because a deputy was present with him at all times during his hospital visit on January 16, 2007; and

    (c)   that there was no evidence the incident was used to maintain discipline or restore order at BCDC.

    7.   Claims of excessive force by a pre-trial detainee, like those of an arrestee, are analyzed under the Fourth Amendment's

"objective reasonableness" standard.  **Andrews v. Neer**, **253 F.3d 1052, 1060 (8th Cir. 2001)**. A pre-trial detainee may not be punished, but may be subjected to the use of force necessary to achieve a legitimate institutional interest:

> The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose or those that are rationally related but are excessive in light of their purpose.

**Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989).**

8. When viewed in light of the foregoing standards, the Court finds no merit to Avery's Objections to the R&R as it relates to his claim of excessive force on January 18, 2007.

(a) Avery's claim that the testimony of his eye-witnesses should be evaluated by the finder of fact is without merit, because his witnesses do not significantly advance his claim:

\*   Gary Ross testified that he was downstairs in the day room during the incident, while Avery's cell was upstairs, and that to the extent he could see anything at all, it was by standing on a table.

\*   Noah Dillaplane testified that he did not see what happened, only that he heard it.

\*   Joshua Weston-Hill testified that he was present during the incident, and his testimony would be helpful to Avery were it not for the fact that his version of the incident is so different

-9-

from Avery's that the two cannot be reconciled. Avery testified that Carlton told him to get up, and he refused, saying he was "on bed rest." He testified that Carlton then left his cell, supposedly to check to see if there was a "bed rest" order, and was gone long enough that he fell back asleep. He woke up with Carlton pulling him off his bed. Weston-Hill testified that Carlton did not leave the cell after telling Avery to get up, and that there was no delay between telling Avery to get out of bed and pulling him out. The Court does not understand Avery to suggest that it disbelieve him in favor of Weston-Hill, yet that is the only way Weston-Hill's testimony could benefit Avery.

\*   In addition, Avery's testimony conflicts with his own pleadings. In his Amended Complaint, Avery says nothing about refusing to get up, or claiming to be on "bed rest." He states that Carlton pulled him off his bunk not because he refused to get up, but because he was "slow in responding" when Carlton told him to come out of his cell and into the dayroom.

(b)   Avery's objection that his medical condition was known to defendants because a deputy was present with him at all times during his hospital visit on January 16, 2007, is likewise unavailing. The written instructions Avery was given when he was discharged from the hospital told him to:

\*   take Ibuprofen 800 mg by mouth three times a day with food;

-10-

  \*  follow up with his regular doctor or clinic if there were any problems; and

  \*  return to the emergency room if there were any problems.

 A section of the discharge instructions entitled "LACERATIONS, ABRASIONS, PUNCTURE WOUNDS" indicated that Avery was to clean his abrasions with soap and water and apply antibiotic ointment. There were no check marks or other indications in the section entitled "SPRAINS OR FRACTURES."

 Avery's discharge instructions say nothing whatsoever about bed rest. In the Court's view, no reasonable finder of fact could conclude that verbal instructions were given to Avery that he had to be on bed rest, without mention thereof in the written discharge instructions, when the written instructions covered other matters - arguably of less importance, like taking Ibuprofen or putting ointment on his wounds - in such detail. Hospital personnel knew that Avery was being discharged to the custody of a police officer, and could certainly anticipate that his medical care while in custody would be governed by what was written in the discharge instructions, not by any verbal instructions.

 (c) Avery's third objection is that there is no evidence the incident was used to maintain discipline or restore order at BCDC. The Court disagrees. The evidence indicates that the incident occurred when inmates were directed to leave their cells for breakfast. Avery admits that he refused a specific order to do

this. While he testified that his refusal was justified by his physical condition, his medical records do not support his position. All the BCDC employees involved in the incident testified that they were not aware that Avery had a broken rib, and that there was no "bed rest" order for him.

To accept Avery's contention that the incident was not used to maintain discipline or restore order - in the face of this evidence - would be to accept the proposition that inmates are free to ignore the commands of their jailers when they think they have good reason to do so. Merely to state the proposition is to show how unfounded it is. No penal institution could operate with safety, security and efficiency if the inmates were allowed to choose whether to follow orders or not.

**IT IS THEREFORE ORDERED** that plaintiff's Objections to the Report And Recommendation are **overruled.**

**IT IS FURTHER ORDERED** that the **Report And Recommendation Of The Magistrate Judge** (document #151) is **adopted in toto,** and this case is **dismissed with prejudice.**

**IT IS SO ORDERED.**

/s/ Jimm Larry Hendren
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE